IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 9, 2013 Session

IN RE JALIN M. B., ET. AL.

Appeal from the Juvenile Court for Knox County
No. E8753    Hon. Timothy E. Irwin, Judge

No. E2013-00635-COA-R3-JV-FILED-MARCH 19, 2014

This is an appeal from the trial court's final order modifying a custody arrangement that designated Mother as the primary residential parent and awarded Father limited visitation. Father filed a petition to modify, claiming that a material change in circumstances necessitated a change in the parenting plan. Following a hearing, the trial court designated Father as the primary residential parent, awarded the Parents equal time with the Children, and modified Father's child support obligation. Mother appeals. We affirm the trial court's custody determination but reverse its child support determination. The case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Angela G. Baker

R. Stephen Merritt, Maryville, Tennessee, for the appellee, Kenley G. Wald.

**OPINION**

**I. BACKGROUND**

Angela G. Baker ("Mother") and Kenley G. Wald ("Father") were in a relationship that resulted in the birth of Son on August, 2002, and Daughter on October, 2005. Mother and Father (collectively "the Parents") never married, and the interactions between them have been contentious, at best. Mother was originally designated as the primary residential parent,

while Father enjoyed limited visitation with Son and Daughter (collectively "the Children") and was tasked with remitting child support. Numerous parenting plans and petitions for modification of those plans were entered throughout the years. The petitions at issue in this case were filed on July 22, 2011, and June 29, 2012.

In the 2011 petition, Father alleged, in pertinent part, that the Children had received excessive tardies throughout the last school year while in Mother's care; that Mother refused to notify Father of the Children's medical issues or school activities; that Mother interfered with Son's participation in his baseball league; that Mother made derogatory remarks about Father and his parents in the Children's presence; that Mother interfered with Father's right to contact the Children; and that Mother was living with a man she alleged had abused her. He also specifically alleged that on July 17, 2011, Mother "caused a scene" at Son's baseball game by grabbing the Children and screaming obscenities as she attempted to leave with the Children. He claimed that Mother's inappropriate remarks were directed toward him, his parents, and Son's coaches and were made in the presence of the other children on the team and their respective parents. He claimed that given the aforementioned allegations, a material change in circumstances necessitated a change in the parenting plan. He requested designation as the primary residential parent and equal parenting time with the Children.

Mother denied any wrongdoing and alleged that Father had violated the terms of the existing parenting plan by excluding Mother from participation in Son's extracurricular activities; by not contributing to Daughter's extracurricular activities; by making derogatory remarks about Mother in front of the Children; by failing to return the Children at the scheduled time; and by not engaging with the Children during visitation, namely he often left the Children with his parents or forced Daughter to wait in the car while he coached Son's baseball team.

The Parents eventually came to an agreement and submitted a new parenting plan, which was approved by the juvenile court referee. The new plan retained Mother's designation as the primary residential parent, while providing Father with increased visitation. Father was given individual visitation time with Daughter on Mondays, with Son on Thursdays, and with the Children on Tuesdays and on alternating weekends. The Parents also agreed that on a case-by-case basis, "Father may co-parent the [C]hildren overnight on Tuesday nights and return the [C]hildren to school on Wednesday." Due to Father's work schedule, his father, Kenley Wald, Sr., was specifically permitted to retrieve the Children from school to facilitate visitation. The order provided,

> The parties further agree that Mr. Wald, the paternal grandfather, shall be
> listed as an individual allowed to pick up either or both of these children and

the parties further agree that his name will not be removed from that list for any reason.

The Parents also agreed that they would be actively involved in the baseball league of Son's choosing and that they would "coordinate the [C]hildren's athletic and extracurricular events and . . . attend or make the [C]hildren available." Father agreed to bear the cost of Son's participation in baseball, while the Parents agreed to equally split any additional extracurricular activities for the Children.

Approximately three months later, Father filed the 2012 petition for modification. Father alleged that Mother refused to allow Mr. Wald to retrieve the Children for Father's visitation and insisted that Father retrieve the Children himself; that Mother had "on several occasions" refused to allow Son to participate in various baseball games; that she punished Son for participating in one of said baseball games without her permission; that her punishment impeded Son's ability to complete schoolwork and interfered with Son's communication with Father; that she impeded Son's ability to complete homework while with her, thereby forcing him to spend his time with Father completing homework; that she unilaterally enrolled Daughter in a gymnastics class on Monday nights, thereby impeding his ability to exercise his visitation with Daughter; that she interfered with his attempts to contact the Children; and that she never allowed overnight visitation on Tuesday nights as previously agreed. He claimed that given the aforementioned allegations, a material change in circumstances necessitated a change in the new parenting plan. He requested designation as the primary residential parent and increased parenting time with the Children.

Mother denied any wrongdoing. Shortly thereafter, a hearing was held before the Magistrate of Knox County Juvenile Court. The Magistrate found that a material change in circumstances had occurred and that a modification in the parenting plan was in the best interest of the Children. In so finding, the Magistrate designated Father as the primary residential parent after providing an extensive analysis supporting its decision. Mother appealed to the Knox County Juvenile Court Judge.

A hearing was held at which several witnesses testified. Jason Hines, the former guardian at litem assigned to this case, testified that he was originally appointed to the case because there were allegations of physical abuse involving Mother's boyfriend. He related that the allegations of abuse were unfounded but that he ultimately remained involved in the dispute based upon the Parents' agreement to split his fee. He stated that he received payment from Father but had not yet received any payment from Mother. He claimed that after the Parents reached an initial agreement regarding visitation, the congeniality quickly dissipated.

Mr. Hines believed that it was difficult for Mother to share the parenting responsibilities because she had been the primary caregiver for several years without Father's participation. He opined that Mother viewed the Children as her own and could not admit that Father also had a role to play in raising the Children. He stated that Mother failed to facilitate Son's participation in his baseball league and that when he spoke with Mother about her failure to follow the court order, she was "very hostile" toward him and showed "antipathy toward[] the whole process." He recalled that Mother even claimed that she never received the court order. He related that he read portions of the transcript to Mother in an effort to remind her that she had agreed to the terms contained in the order. He explained that the agreement had also been reached to allow Father to establish a relationship with Daughter. He stated that he was disappointed to learn that Mother had scheduled Daughter for gymnastics on Father's appointed visitation day.

Relative to the Children, Mr. Hines testified that he was initially concerned about Son's lack of academic achievement and the Children's unexcused tardies and absences while in Mother's care. He stated that he met with the Children on at least three occasions. He claimed that the last time he spoke with them, Son was "very subdued" and refused to look at him while talking.

Nicholas Hard, Son's baseball coach, testified that Father and his parents usually attended Son's baseball tournaments, while Mother rarely attended. He related that Father and his parents were present for a tournament in July 2011, when Mother arrived after the game and attempted to take the Children home. He claimed that they had just lost the game and that he was talking to the players and their families when Mother pulled Son "up by his backpack" as she screamed, "[T]his is f***ing b******t." He recalled that another coach confronted Mother when Son began to cry. He stated that Mother then screamed obscenities toward that coach before also screaming at Son's grandparents on her way off the field.

Amanda Wallace, a human resources officer for RMB, Incorporated, testified that Mother was employed in the IT Department from July 2011 until January 2012. She recalled that Mother was fired because she was "[u]nsuitable for departmental needs." She believed that Mother's attendance was one of the issues that led to Mother's termination of employment. She stated that Mother was informed that her employment had been terminated, Mother claimed that her boss had sexually harassed her. She insisted that Mother had not made any prior claims of sexual harassment but that she investigated the claim and found no evidence of sexual harassment.

Kaedra Blue testified that she and Father also had a child together. She related that Father had a "pretty good relationship" with their daughter, despite the fact that he was not able to visit her for extended periods of time because she lived in Marietta, Georgia. She

claimed that since she moved closer to Father, he visits the child at least once a week and talks to her on the telephone "pretty frequently." She stated that she had not sought child support from Father but that he was "very good" about providing for the Child. She acknowledged that she did not have a good relationship with Mother, who informed her that Father was expecting a child with Mother by placing a note on her car's windshield. She admitted that Father initially denied his paternity of Daughter but stated that he eventually accepted responsibility for Daughter.

Mr. Wald, the paternal grandfather, testified that he enjoyed a "great" relationship with the Children and that he and his wife spent extensive time with them and even took them on trips. He recalled that he was initially designated to retrieve the Children from school to facilitate Father's visitation with them. He claimed that when he attempted to retrieve Son, he was informed that he had not been given the authority to retrieve Son. He acknowledged that his relationship with Mother had recently deteriorated and that he last spoke to Mother in July 2011 when she attempted to retrieve the Children from Son's baseball game and interrupted the coach's talk with the players. He stated that when he confronted Mother about her behavior, she responded with profanity while the Children were crying beside her.

Father testified that he was married to Kim Wald, who had two children of her own. He stated that he and his wife owned their own home, a three-bedroom, two-bathroom ranch style home with a backyard and pool. He related that Son shared a bedroom with his stepbrother, while Daughter shared a bedroom with her stepsister. He claimed that he and his wife enjoyed a good relationship with their stepchildren and that they often spent time alone with their stepchildren to further foster a relationship.

Father testified that he was initially concerned for the Children because they had received excessive tardies and absences from school while in Mother's care during the 2011-2012 school year. He recalled that while in Mother's care, Son even stole a snack from another child at school. He stated that Mother refused to regularly communicate with him concerning the Children, impeded his ability to speak with the Children, and even failed to inform him that the Children were sick on at least one occasion. He related that he was also upset because Mother scheduled Daughter's gymnastics class on his individual visitation day with Daughter. He claimed that despite his frustration, he attended Daughter's class and monetarily contributed to her new extracurricular activity. He insisted that Mother failed to regularly attend Son's practices and games for his current baseball league and had even registered Son for a new baseball league, despite the court's directive to allow Son to pick only one baseball league. He stated that she prevented Son from participating in his current league on several occasions. He acknowledged that one such occasion occurred because Son had been caught stealing at school.

He stated that pursuant to the Magistrate's order, the Children had primarily stayed with him since November 2012. He opined that since he regained custody of the Children, Son's grades had improved and their unexcused absences and tardies had decreased. He believed that the Children had adjusted well to living with him and had not shown any signs of behavioral problems. He claimed that despite their improvement, Mother had discussed the case with the Children and had even spoken with them about the case the day before trial.

Stacey Simons, Mother's sister, testified that Mother loved the Children "very much" and was an "awesome mother." She claimed that prior to the change in custody, the Children were "goofy, funny, cut-up kids" that "love[d] to have fun, love[d] to be goofy." She opined that since the change in custody, the Children were "very quiet and very withdrawn" and had gained weight. She stated that Father and his parents treated Daughter differently and that their treatment was evident in the presents they gave each child for Christmas. She recalled that Daughter requested to speak to Santa Claus at the mall and proceeded to ask him for a new room at Mother's house. She acknowledged that the Children shared a bedroom at Mother's house.

Caleb Lewis, Mother's boyfriend, testified that he first met the Children in June 2012. He alleged that he noticed changes in the Children since Father became the primary residential parent. He related that Daughter was "much clingier" to Mother and that Son was "more protective" of Mother and seemed "very concerned . . . about her well-being in general." He claimed that the Children's attitude had also changed for the worse. He confirmed Ms. Simons's account of the disparity in Christmas presents. He stated that he had seen the Children at school "a number of times" and observed that Daughter's clothes were "usually a little bit too tight" and that she did not appear to be "really taken care of when she [came] back from" Father's house. He acknowledged that he had slept overnight at Mother's house while the Children were present.

Martha Aleshire, Mother's aunt, testified that Mother was an "awesome" mother. She recalled that Father was not involved in Daughter's life when she was born and that Father often visited with Son but not Daughter.

Suzanne Rickehard, Mother's friend, described Mother as a "[w]onderful, amazing" mother. She also noticed a change in the Children since Father became the primary residential parent. She claimed that the Children were "quiet" and refused to leave Mother's side during visitation.

Katherine Baker, the maternal grandmother, testified she could "take lessons from [her] daughter" on raising children and described her as an "exemplary mother." She too noticed a change in the Children since Father became the primary residential parent and

explained that the Children did not want to leave Mother during visitation and appeared to have gained weight. She claimed that Father denied his paternity of Daughter "for the longest time."

Mother testified that she had been the primary custodian of the Children since birth until November 2012. She alleged that Father did not visit Daughter or claim her as his own until she was two years old. She related that she and Father had "always been combative" and that their relationship had not really changed. She claimed that she never agreed to allow Mr. Wald to retrieve the Children on their individual visitation days with Father because those days were specifically designated for Father to "nurture a bond" with the Children. Relative to the agreement codified in the court order following the filing of the 2011 petition, Mother acknowledged that she was present at the hearing but claimed that she was unaware of the precise stipulations that her attorney approved and that some of her requested stipulations were not included in the agreement. Mother admitted that she prohibited Son from participating in his baseball league on a few occasions. She explained that the schedule conflicted with church and that Son was already participating in another league.

Relative to the July 2011 incident at the baseball game, Mother explained that the Children had spent approximately nine days with Father and were scheduled to return to her that night by 6:00 PM. She recalled that she was notified at 5:00 PM that Father was not going to return them at the appointed time because he was "running late." They argued, and she called Mr. Wald because Father refused to tell her where he was with the Children. Upon learning that the Children were at the baseball field, she traveled to the field and retrieved the Children. She acknowledged arguing with Mr. Wald and his wife and using profanity but insisted that she never spoke to anyone involved with Son's baseball league.

Following the presentation of the above evidence, the trial court affirmed the Magistrate's designation of Father as the primary residential parent. However, the court ordered split visitation, namely the Parents were responsible for supervising one child each week on an alternating schedule and both children on alternating weekends. In so finding, the Court found that a material change in circumstances had occurred as evidenced by Mother's "hateful vindictiveness" and "hysterical conduct." Relative to child support, the court acknowledged that Father's income was higher than Mother's income but held that it was not awarding child support because he was giving each parent equal time with the Children. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A. Whether the trial court erred in modifying the custody arrangement.

B. Whether the trial court erred in calculating the child support obligation.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

In matters of child custody, trial courts are vested with broad discretion, and appellate courts will not interfere with the trial court's decision except upon a showing of erroneous exercise of that discretion. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 836-37 (Tenn. Ct. App. 1997). "'Because [c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during . . . proceedings,'" appellate courts "are reluctant to second-guess a trial court's decisions.'" *Hyde v. Amanda Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010) (quoting *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)).

## IV. DISCUSSION

### A.

Mother asserts that the trial court erred in modifying the existing custody arrangement because there had not been a change of circumstances that necessitated a change in the custody arrangement and because a change in custody was not in the best interest of the Children. Father responds that the trial court's decision was supported by the evidence.

"A custody decision, once final, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made." *Scofield v. Scofield*, No. M2006-

00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 246 S.W.2d 93, 95 (Tenn. 1952)). However, because the circumstances of children and parents change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." *Scofield*, 2007 WL 624351, at *2 (citing Tenn. Code Ann. § 36-6-101(a)(1)). Modification of an existing custody or visitation arrangement involves a two-step analysis. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). "If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interest[]." *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (footnote omitted).

The determination of whether a "material change in circumstance" occurred requires a different standard depending upon whether a parent is seeking to modify custody (i.e., change the primary residential parent) or modify the residential parenting schedule. Tenn. Code Ann. § 36-6-101(a)(2)(B), (C). The Tennessee Code establishes a lower threshold for modification of a residential parenting schedule. *Scofield*, 2007 WL 624351, at *3. Here, the trial court modified custody by designating Father as the primary residential parent. Thus, the higher threshold applies. *Pippin v. Pippin*, 277 S.W.3d 398, 406-07 (Tenn. Ct. App. 2008). The Code provides, in pertinent part,

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> > (i) In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

Tenn. Code Ann. § 36-6-101(a)(2)(B). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008) (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). However, to determine whether a material change in circumstances has occurred, the court should consider whether:

(1) the change occurred after the entry of the order sought to be modified;
(2) the changed circumstances were not reasonably anticipated when the
underlying decree was entered; and (3) the change is one that affects the
child's well-being in a meaningful way.

*Cosner*, 2008 WL 3892024, at *4 (citing *Kendrick*, 90 S.W.3d at 570).

In this case, the Parents agreed to the parenting plan at issue. However, Mother failed
to comply with several requirements of the plan and continued to be contentious and spiteful
when dealing with matters of visitation. Mother's refusal to adhere to the plan she agreed
to was a material change in circumstance that was not reasonably anticipated and that
affected the Children's well-being in a meaningful way. Accordingly, we conclude that the
trial court did not err in determining that a material change of circumstance occurred, thereby
necessitating the further determination of whether a change of custody was in the Children's
best interest.

Having concluded that a material change of circumstance occurred, we must now
determine whether the trial court erred in finding that the designation of Father as primary
residential parent and the corresponding decision to award equal visitation to each parent was
in the Children's best interest. While the court did not issue specific findings of fact on this
issue, the record and the court's general findings support the trial court's ultimate decision.
*See generally Cranston*, 106 S.W.3d at 645 (providing that the record on appeal and the
court's findings were sufficient to facilitate appellate review even though the court applied
the wrong standard when changing the original custody order). Indeed, the trial court is not
required to articulate every fact and its application in custody cases. *See Murray v. Murray*,
No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010)
(stating that "while the statute requires the trial court to consider all the applicable factors,
there is no statutory requirement that the court list every applicable factor along with its
conclusion as to how that particular factor impacted the overall custody determination").
However, "[w]hen the trial court makes no specific findings of fact . . . we must review the
record to determine where the preponderance of the evidence lies." *Kendrick*, 90 S.W.3d at
570 (citing *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)).

Relative to the child's best interest, Tennessee Code Annotated section 36-6-106(a)
provides, in pertinent part,

(a) In . . . any other proceeding requiring the court to make a custody
determination regarding a minor child, the determination shall be made in the
best interest of the child. In taking into account the child's best interest, the
court shall order a custody arrangement that permits both parents to enjoy the

-10-

maximum participation possible in the life of the child consistent with the factors set out below, the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents [] and the child;

(2) The disposition of the parents [] to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent [] has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .;

(4) The stability of the family unit of the parents [];

(5) The mental and physical health of the parents [];

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preference of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent, or to any other person . . .;

(9) The character and behavior of any other person who resides in or frequents the home of the parent [] and the person's interactions with the child; and

(10) Each parent's [] past and potential for future performance or parenting responsibilities, including the willingness and ability of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

In setting the residential schedule, the trial court is also instructed to consider similar, relevant factors. *See* Tenn. Code Ann. § 36-6-404(b) (listing additional factors).

While Mother previously served as the primary caregiver for a number of years, the relevant factors are fairly equally weighted between the Parents. However, the record is clear that Mother's ability to facilitate and encourage a close and continuing parent-child relationship between the Children and Father is severely lacking. To his credit, Father attempted to establish relationships with the Children, despite Mother's constant interference. With all of the above considerations in mind, we conclude that the preponderance of the evidence supports the trial court's naming of Father as the primary residential parent as being in the best interest of the Children. Accordingly, we affirm the decision of the trial court but further advise the Parents that failure to promote and encourage a close relationship between the Children and the other parent may result in the custody determination being reviewed in the future.

B.

Mother asserts that this case must be remanded because the trial court failed to properly consider the child support guidelines before determining that neither party owed child support. Father responds that remand is unnecessary because the trial court's reasonable departure from the child support guidelines was apparent from the record.

In this state, child support is governed by Tennessee Code Annotated section 36-5-101. "In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines" that are promulgated by the Tennessee Department of Human Services Child Support Service Division. Tenn. Code Ann. § 36-5-101(e)(1)(A); *see generally* Tenn. Comp. R. & Regs. 1240-02-04. The guidelines "are a minimum base for determining child support obligations. The presumptive child support order may be increased according to the best interest of the child for whom support is being considered, the circumstances of the parties, and the rules of [the] chapter." Tenn. Comp. R. & Regs. 1240-02-04-.01(4). The guidelines provide,

> (1) Required Forms
>
> > (a) These rules contain a Child Support Worksheet, a Credit Worksheet, Instructions for both Worksheets, and the Child Support Schedule which shall be required to implement the child support order determination.

-12-

(b) The use of the Worksheets promulgated by the Department is *mandatory* in order to ensure uniformity in the calculation of child support awards pursuant to the rules.

. . .

(e) The completed Worksheets *must be maintained* as part of the official record either by filing them as exhibits in the tribunal's file or as attachments to the order.

Tenn. Comp. R. & Regs. 1240-02-04-.04 (emphasis added). In setting the amount of support owed, the court may choose to deviate from the guidelines. If the court chooses to deviate, the court "shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child or children, or the equity between the parties." Tenn. Code Ann. § 36-5-101(e)(1)(A). Additionally, the court "shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines." Tenn. Code Ann. § 36-5-101(e)(1)(A).

A modification of the support owed may be requested pursuant to the guidelines under certain circumstances. Tenn. Comp. R. & Regs. 1240-02-04-.05(6). "To determine if a modification is possible, a child support order shall first be calculated on the Child Support Worksheet using current evidence of the parties' circumstances." Tenn. Comp. R. & Regs. 1240-02-04-.05(3) (emphasis added). If a significant variance exists between the current order and the proposed amount, "such a variance would [generally] justify the modification of a child support order." Tenn. Comp. R. & Regs. 1240-02-04-.05(3).

We agree that once Father was designated as the primary residential parent and received increased parenting time, he was entitled to file a petition to modify his child support obligation. The record reflects that, in part, the court considered the award of equal parenting time and Father's new designation as primary residential parent in refusing to award child support to Mother. However, the trial court should have considered the child support guidelines and utilized the child support worksheet before determining that child support was not warranted. Accordingly, we reverse the decision of the trial court as it pertained to child support and remand the case with instruction to the trial court to utilize a child support worksheet. If the trial court deviates from the guidelines, the reason for the deviation must be adequately explained on the record.

## V. CONCLUSION

The judgment of the trial court is affirmed in part, as to the modification of custody and reversed in part, as to the modification of child support. The case is remanded for proceedings consistent with this opinion. Costs of the appeal are taxed equally to the appellant, Angela G. Baker, and to the appellee, Kenley G. Wald.


_____
JOHN W. McCLARTY, JUDGE